IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                                   )
      Plaintiff,                   )          Case No. 08-20201
                                   )
v.                                 )
                                   )
BOBBY DEANGELO SMITH,              )
                                   )
                                   )
      Defendant.                   )

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court are Defendant Bobby DeAngelo Smith's Motion to Suppress (Def.'s Mot., ECF No. 198) and Smith's objections to the Report and Recommendation of Magistrate Judge Tu M. Pham (Objections to Magistrate's Report and Recommendations, ECF No. 264) ("Objections"). Magistrate Judge Pham recommended that the Court deny Smith's Motion to Suppress. (Report and Recommendation 22, ECF No. 243.) ("Report") After reviewing Smith's objections, the Court OVERRULES them and ADOPTS the Report of the Magistrate Judge. The Motion to Suppress is DENIED.

### I.   Procedural and Factual Background

On June 26, 2008, the grand jury returned an indictment charging Smith and Regina Hinton with four counts of

counterfeiting United States currency with intent to defraud, in violation of 18 U.S.C. § 471, and four counts of knowingly possessing and concealing counterfeit United States currency, in violation of 18 U.S.C. § 472. (Indictment 1-8, ECF No. 14.) The indictment also charged Smith with one count of knowingly possessing a firearm and one count of knowingly possessing ammunition after having been convicted of a crime punishable by imprisonment for more than one year, in violation of 18 U.S.C. § 922(g). (Id. at 9-10.) A Superseding Indictment charged Smith and Hinton with one count of conspiracy, one count of counterfeiting with intent to defraud, one count of knowingly attempting to pass counterfeit money, and one count of knowingly possessing and concealing counterfeit money; it also charged Smith with one count of possessing a firearm and one count of possessing ammunition after having been convicted of a felony. (Superseding Indictment 1-7, ECF No. 76.) A Second Superseding Indictment added Dannette Ross, Smith's mother, as a defendant, and, in addition to the charges in the Superseding Indictment, charged Smith, Hinton, and Ross with conspiracy to corruptly influence or impede an official proceeding, and attempting to influence or impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). (Second Superseding Indictment 1-10, ECF No. 96.) The Second Superseding Indictment also charged Ross

2

with one count of possessing counterfeit money with intent to defraud, in violation of 18 U.S.C. § 472. (Id. at 11.)

Smith filed a Motion to Suppress the evidence U.S. Secret Service agents found at Hinton's apartment, statements made by Smith and Hinton to the agents, and the fruits of the allegedly illegal seizure of Smith and Hinton.[1] (See Def.'s Mot. 1, 11.) The United States filed a response. (Government's Resp. to Def.'s Mot. to Suppress, ECF No. 202.)

This Court referred the Motion to the Magistrate Judge for hearing and recommendation. (See Order of Reference, ECF No. 199.) Magistrate Judge Pham held a hearing on May 11, 2010, heard testimony from five witnesses, and admitted thirteen exhibits into evidence. (Report 1.) At Smith's request, Magistrate Judge Pham permitted the parties to file post-hearing briefs. (Id. at 1-2.) Smith filed a Memorandum in Support of his Motion to Suppress. (Def.'s Post Hr'g Mem. in Supp., ECF No. 227.) The United States responded. (Resp. to Def.'s Post Hr'g Mem. Br., ECF No. 230.) Following these filings, Magistrate Judge Pham filed a Report on August 16, 2010, recommending that this Court deny Smith's Motion. (Report 2, 22.) Smith timely filed his objections to the Report. (See Objections.)

---

[1] In his Motion to Suppress, Smith also requested suppression of an affidavit that former counsel was ordered to turn over to the government. (Def.'s Mot. 1.) However, Smith's counsel at the suppression hearing stated that he was no longer seeking suppression of the affidavit. (Report 9.)

Smith objects to three conclusions of the Magistrate Judge: (1) that agents had probable cause to arrest Hinton, (2) that agents had probable cause to arrest Smith, and (3) that Hinton's consent to the search of the apartment was not the product of coercion.[2]  (See Objections 1-4.)  Smith also claims that the government used coercion to obstruct justice during the suppression hearing by preventing Hinton from testifying.  (Id. 2-3.)

The pending charges stem from a call placed by Terri Neyland, the manager of a Casual Male clothing store, to U.S. Secret Service Agent William Jordon[3] around 4:00 p.m. on June 3, 2008.  (Report 2-3.)  Neyland told Agent Jordon that a man and a woman had come into the store and attempted to purchase merchandise with counterfeit money, which Neyland rejected.  (Id. at 3.)  Neyland stated that the couple then used genuine money to pay for the merchandise and left the store and, after they had left, Neyland contacted neighboring retail stores and

---

[2] The Objections also state in a one-sentence paragraph that "[t]he defendant objects, to the Magistrates [sic] finding that the defendant ever at any time attempted to suppress Hinton's."  (Objections 2.)  This argument fails to "identify the portions of the magistrate's recommendation to which objection is made and the basis for the objection." Martin v. LaBelle, 7 F. App'x 492, 494 (6th Cir. 2001) (quoting Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995)).  Because "[t]he filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object," Cole v. Yukins, 7 F. App'x 354, 356 (6th Cir. 2001), Smith's vague statement is a failure to object to any portion of the Report that Smith intended to contest.

[3] The Report and Suppression Hearing Transcript inconsistently refer to the agent's last name as Jordon and Jordan.  The Court will refer to the agent as Agent Jordon, the name listed on exhibits offered at the suppression hearing. (See, e.g., Hr'g Ex. 3.)

learned that the same couple, later identified as Smith and Hinton, had attempted to purchase merchandise with counterfeit money at a nearby Stein Mart store. (Id.)

In response to Neyland's telephone call, Agent Jordon left his office and drove toward Stein Mart. (Id.) On the way, he received a call from Amanda Swain, a loss-prevention employee of Stein Mart, who told him that the man and woman who had attempted to use counterfeit money were inside Stein Mart attempting to return previously purchased merchandise. (See id.) In response to Agent Jordon's call to his office for assistance, Agents Patrick Davis and David Stutheit arrived at Stein Mart's parking lot. (Id.) While Agents Jordon and Stutheit waited in the parking lot, Agent Davis went inside Stein Mart to meet with store personnel and determine whether Smith and Hinton were still there. (Id.) A loss-prevention employee told Agent Davis that they were still in the store and identified them. (Id. at 3-4.)

Agent Davis followed Smith and Hinton when they left the store and identified them as the couple passing counterfeit money to Agents Jordon and Stutheit. (Id. at 4.) When Smith and Hinton entered Smith's car, Agent Jordon pulled his car behind Smith's car and activated his emergency lights and siren. (Id.) At the same time, Agent Davis approached Smith, drew his firearm, identified himself, and ordered Smith out of his car.

5

(See id.)  Agent Davis then asked Smith if he had any weapons on his person, and Smith replied that he had a knife in his pants pocket.  (Id.)  Agent Davis escorted Smith to the rear of the car, asked Smith to put his hands on the back of the car, pulled the knife out of Smith's pants pocket, and patted Smith's exterior.  (Id.)  While patting Smith's exterior, Agent Davis felt a wad of money and pulled it out of Smith's pocket.  (Id.)  Agent Davis handed the money to Agent Jordon, who immediately determined that the wad contained counterfeit money.  (Id.)

Smith was then placed in Agent Jordon's car and Agent Jordon told Smith that the agents were investigating counterfeit money being passed to stores.  (Id.)  Smith admitted that the money was counterfeit, but said he had won it "shooting dice." (Id.).  Smith then gave Agent Jordon consent to search his car. (Id. at 4-5.)  Inside it, agents found receipts for cash transactions.  (Id. at 5.)

Hinton was then placed in a separate car, and Smith and Hinton were transported to the Secret Service office.  (Id.)  At that office, the agents learned that Smith was a convicted felon on supervised release and placed him and Hinton in separate interview rooms.  (Id.)  Before questioning Smith, Agent Jordon informed Smith of his Miranda rights, and Smith signed a form waiving them.  (Id.; Hr'g Ex. 1.)  Smith initially stated that he had won the counterfeit money shooting dice, but changed his

6

story and said that he had bought the counterfeit money from Richy Rich. (Report 5.) Smith admitted he had attempted to pass counterfeit money at Casual Male and had provided Hinton with counterfeit money that she attempted to use at Stein Mart. (Id.) Smith then signed and dated a written statement saying he bought the counterfeit money from Richy Rich and offered to serve as an informant against Richy Rich. (Id. at 5-6; see Hr'g Ex. 2.) At no point did Agent Jordon promise Smith that he would be permitted to be an informant or that, if he cooperated, he would not be prosecuted. (Report 6.) Instead, Agent Jordon told Smith that the prosecutor would be notified of any cooperation. (Id.)

Meanwhile, Agents Jeffrey Barker and Sonny Low interviewed Hinton in a separate room. (Id.) Before questioning Hinton, Agents Barker and Low gave Hinton a form containing Miranda warnings, read the Miranda warnings aloud, had her read the warnings back to them, and had her sign a form waiving them. (Id.; Hr'g Ex. 7.) Hinton then said that she and Smith had attempted to use counterfeit money to purchase merchandise at Casual Male and Stein Mart. (Report 6.) She stated that one of Smith's prior girlfriends had showed him how to print counterfeit money and he had bought a printer for that purpose. (Id.) She said that she and Smith lived together in an apartment, Smith printed counterfeit money at the apartment with

7

her help, and they sold the counterfeit money. (Id. at 6-7; see Hr'g Ex. 5 at 1, 6 (listing Hinton as the occupant of the apartment).) She then said the agents could search the apartment where she lived with Smith and signed a form consenting to a complete search of the premises and seizure of contraband or evidence of counterfeiting found in the apartment. (Report 7; Hr'g Ex. 6.) The form stated that Hinton gave her permission voluntarily and without threats, duress, or any promises. (Report 7; Hr'g Ex. 6.)

Agents Barker and Low then drove Hinton to the apartment and used Hinton's key to enter it. (Report 7.) In the apartment, the agents found large sheets of uncut counterfeit money, a printer, paper cutters, bleached genuine money, and other items used to produce counterfeit money. (See id. at 7-8; Hr'g Ex. 9-10.) While searching Hinton and Smith's shared bedroom, agents saw a revolver partially protruding from underneath the mattress, took a photograph of it, and seized it. (Report 8; Hr'g Ex. 11.) Later, agents found a box of ammunition in the living room. (Report 8.) Hinton never indicated during the search that agents were not permitted to search a particular area and never attempted to revoke her consent to search. (Id.) At the apartment, Hinton provided a signed, written statement confirming that Smith counterfeited money in the apartment and that she and Smith attempted to use

counterfeit money at Stein Mart and Casual Male.  (See id.; Hr'g Ex. 8.)

**II.  Standard of Review**

When a party objects to a magistrate judge's ruling on a Motion to Suppress, a district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1).  District courts are not required to review – under a de novo or any other standard — those aspects of the report and recommendation to which no objection is made.  Thomas v. Arn, 474 U.S. 140, 150 (1985).  District courts adopt the findings and rulings of the magistrate judge to which a party files no specific objection.  See id. at 149-50; United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981).

**III. Analysis**

**A.   The Agents Had Probable Cause to Arrest Hinton**

Smith's first objection is to Magistrate Judge Pham's conclusion that agents had probable cause to arrest Hinton.[4]

---

[4]  The Court construes the first two paragraphs of Smith's Objections as raising this objection.  The first paragraph states: "The defendant objects to the Magistrate's findings which are not supported by the record.  The Magistrate found that there was probable cause to arrest the co-defendant, Regina Hinton.  The record is devoid of any evidence that Hinton possessed

(See Objections 1-2; Report 13 (finding probable cause to arrest Hinton).)   The basis for Smith's objection is that the agents lacked any reason to believe Hinton possessed counterfeit money or had attempted to make purchases with counterfeit money.   (See Objections 1-2.)

Smith's objection is not well-founded.   As a threshold matter, Smith lacks standing to argue that the agents lacked probable cause to arrest Hinton.   "The Fourth Amendment provides protection against 'unreasonable searches and seizures,' and 'the arrest of a person is quintessentially a seizure.'"   El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (quoting Payton v. New York, 445 U.S. 573, 585 (1980)).   Not everyone may assert Fourth Amendment Rights.   See United States v. Williams, 354 F.3d 497, 510-11 (6th Cir. 2003) ("It is well-established that 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" (quoting Rakas v. Illinois, 439 U.S. 128, 133-34 (1978))). "[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved

---

any counterfeit currency or that she ever demonstrated an attempt to defraud. Furthermore, Hinton wasn't even questioned to provided [sic] the agent any self incriminating evidence."   (Objections 1.)   The second paragraph states: "The defendant objects, [sic] to the Magistrate findings that testimony of a call to the Secret Service agents that two individuals had attempted to pass counterfeit was enough to support probable cause contrary to common law . . ."   (Id. at 1-2.)

solely by the introduction of damaging evidence. Co-conspirators and codefendants have been accorded no special standing." Id. (quoting United States v. Padilla, 508 U.S. 77, 81-82 (1993)).

Here, Smith may not challenge the constitutionality of the arrest of Hinton, a co-defendant and alleged co-conspirator, because he cannot "demonstrate[] that his Fourth Amendment rights were violated by the challenged search or seizure." Padilla, 508 U.S. at 81. That he is a co-defendant and alleged co-conspirator is not enough. See, e.g., United States v. Hopper, 58 F. App'x 619, 624-25 (6th Cir. 2003) (holding that defendant could not suppress evidence based on the allegedly illegal seizure of his wife); United States v. Boyd, No. 03-2952-M1/V, 2006 WL 3841799, at *7 (W.D. Tenn. Dec. 29, 2006) (finding that, because a defendant lacked standing to challenge the probable cause for the arrest of a co-defendant, the defendant's attorney did not render ineffective assistance by failing to challenge that arrest); United States v. Chavez, 75 F. Supp. 2d 1015, 1019 (W.D. Mo. 1999) (finding that defendant lacked standing to challenge the legality of a co-defendant's arrest).

Even if Smith had standing, his objection would fail. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

11

unreasonable searches and seizures." U.S. Const. amend. IV.
When officers lack probable cause, an arrest of a suspect
violates her Fourth Amendment right against unreasonable
seizure. See United States v. Torres-Ramos, 536 F.3d 542, 554
(6th Cir. 2008); Ingram v. City of Columbus, 185 F.3d 579, 592-
93 (6th Cir. 1999). "'Probable cause exists where the facts and
circumstances within the officer's knowledge . . . are
sufficient to warrant a prudent person, or one of reasonable
caution, in believing, in the circumstances shown, that the
suspect has committed, is committing, or is about to commit an
offense.'" United States v. Campbell, 486 F.3d 949, 957 (6th
Cir. 2007) (quoting United States v. Sangineto-Miranda, 859 F.2d
1501, 1508 (6th Cir. 1988)) (omission in original). Reviewing
courts must be careful, however, to remember that "probable
cause is a fluid concept – turning on the assessment of
probabilities in particular factual contexts – not readily, or
even usefully, reduced to a neat set of legal rules." Illinois
v. Gates, 462 U.S. 213, 232 (1983).

Here, the agents had probable cause to arrest Hinton.
Although the record is unclear about precisely when Hinton was
arrested, she could not have been arrested before she and Smith
entered Smith's car and Agent Jordon pulled behind the car and
activated his emergency lights and siren. (Report 4.) Before
then, Hinton would not have had notice that the agents were

aware of her and Smith's attempts to use counterfeit money. (See id. at 3-4.) Because she had not been detained or transported to another location, had no restraints on her freedom of movement, had not been exposed to use of weapons or bodily force, and had not been issued Miranda warnings, she was not under arrest before entering Smith's car. See United States v. Williams, 170 F. App'x 399, 402-03 (6th Cir. 2006).

When Agent Jordon pulled behind Smith's car and activated his emergency lights and siren, the agents had specific, reliable information that: (1) a man and a woman had attempted to purchase merchandise with counterfeit money at a Casual Male clothing store (Report 2-3); (2) the couple had attempted to purchase merchandise with counterfeit money at a Stein Mart store (id. at 3); (3) the couple was inside the Stein Mart store at the time of a call to Agent Jordon (id.); (4) a Stein Mart employee had positively identified the couple who had attempted to pass counterfeit money (id. at 3-4); and (5) the identified couple had left the store and entered Smith's car (id. at 4).

Although Smith correctly points out that the agents found no counterfeit money on Hinton in the parking lot, the agents had reliable information that Hinton had attempted to pass counterfeit money at Stein Mart and was with Smith when he attempted to pass counterfeit money at Casual Male. (See Hr'g Tr. 43:7-9, 54:6-22, 76:16-22, May 11, 2010.) The agents also

13

had a positive identification of Hinton by a Stein Mart employee. (Report 3-4.) These facts were "sufficient to warrant a prudent person . . . [to] believ[e], in the circumstances shown, that [Hinton] ha[d] committed" the crimes of knowingly attempting to pass counterfeit money, knowingly possessing and concealing counterfeit money, and conspiring to commit those crimes.[5] <u>Campbell</u>, 486 F.3d at 957; <u>see also</u> 18 U.S.C. § 371 (criminalizing conspiracies between two or more persons to commit any offense against the United States or to defraud the United States); 18 U.S.C. § 472 (stating that "[w]hoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell . . . or keeps in possession or conceals" counterfeit money "shall be fined under this title or imprisoned not more than 20 years, or both"); <u>Fisher v. Wal-Mart Stores, Inc.</u>, No. 09-2696, 2010 WL 3419700, at *4-5 (8th Cir. Sept. 1, 2010) (holding that police had probable cause to support a warrantless arrest where an employee called police and informed them that a store patron was attempting to cash counterfeit money orders, the police viewed the employee as credible, the employee identified the patron who

---

[5] This conclusion is based on resolving the ambiguity in the record about when Hinton was formally arrested in her favor by assuming that the arrest occurred when Agent Jordon blocked the car in its parking space and activated his emergency lights and siren. (<u>See</u> Report 4.) If her arrest did not occur until later, as is likely, evidence subsequently obtained provided additional information supporting probable cause, such as counterfeit money found on Smith's person (<u>Id.</u>), Smith's admission that the money was counterfeit (<u>Id.</u>), and Hinton's admission that she and Smith had attempted to use counterfeit money to purchase merchandise at Casual Male and Stein Mart (<u>Id.</u> at 6).

attempted to cash fake money orders, and a police officer verified the money orders were counterfeit); <u>Franklin v. Miami Univ.</u>, 214 F. App'x 509, 511–12 (6th Cir. 2007) (finding probable cause to arrest based on the statements of two eyewitnesses); <u>United States v. Armstrong</u>, 16 F.3d 289, 294 (8th Cir. 1994) (holding that there was probable cause to support an arrest based on a store clerk's positive identification of the person who gave her a counterfeit $20 bill when she saw him on the street and at the scene of his arrest); <u>United States v. Hernandez</u>, 825 F.2d 846, 849 (5th Cir. 1987) ("Generally, probable cause to arrest for the offense of passing a counterfeit note is established by circumstances showing the passing of a counterfeit note coupled with an identification of the individual who passed the note.") (citations omitted); <u>United States v. Everett</u>, 719 F.2d 1119, 1120 (11th Cir. 1983) (per curiam) ("While intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause to arrest.  The passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note.") (citations omitted).  The agents had probable cause to arrest Hinton.  The Court, therefore, OVERRULES Smith's first objection to the Report of the Magistrate Judge.

15

## B.   The Agents Had Probable Cause to Arrest Smith

Smith's second objection is to Magistrate Judge Pham's conclusion that agents had probable cause to arrest him.[6]  (See Objections 1-2; Report 13 (finding probable cause to arrest Smith).)  The basis for Smith's objection is that calls to the Secret Service stating that he had attempted to pass counterfeit money were insufficient to give the agents probable cause to arrest him.  (See Objections 1-2.)

For the reasons discussed above, Smith's objection is not well-founded.  "A warrantless arrest is lawful if the officer has probable cause to believe that the suspect either is, has, or is about to, commit a crime."  United States v. Johnson, 171 F. App'x 499, 501 (6th Cir. 2006).  "'Probable cause exists where the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  Campbell, 486 F.3d at 957 (quoting Sangineto-Miranda, 859 F.2d at 1508).

---

[6] The Court construes the second and fourth paragraphs of Smith's Objections as raising this objection.  The second paragraph states: "The defendant objects, [sic] to the Magistrate findings that testimony of a call to the Secret Service agents that two individuals had attempted to pass counterfeit was enough to support probable cause contrary to common law . . . ." (Objections 1.)  The fourth paragraph states: "The defendant objects to the Magistrate abdicating it's [sic] authority to properly ascertain the facts surrounding this arrest and consent in order to gain a full grasp the totality of the circumstances [sic] as instructed by the Supreme Court." (Id. at 2.)

Here, the agents had probable cause to arrest Smith. Although the Magistrate Judge concluded that Agent Jordon's pulling behind Smith's car and activating his emergency lights and siren, coupled with Agent Davis's approaching Smith, drawing his firearm, identifying himself, and ordering Smith out of the car, constituted an investigatory stop rather than an arrest, the Court need not address this conclusion. (Report 13 n.13.) Even if this conduct constituted an arrest, the agents had probable cause to arrest Smith by the time Agent Jordon pulled behind Smith's car and Agent Davis approached Smith. Before then, Smith would not have had notice that the agents were aware of his attempts to use counterfeit money. (See id. at 3-4.) Because he had not been detained or transported to another location, had no restraints on his freedom of movement, had not been exposed to use of weapons or bodily force, and had not been issued Miranda warnings, he could not be under arrest before that moment. See Williams, 170 F. App'x at 402-03.

When Agent Jordon pulled behind Smith's car and Agent Davis approached Smith, the agents had specific, reliable information that: (1) a man and a woman had attempted to purchase merchandise with counterfeit money at a Casual Male clothing store (Report 2-3); (2) the couple had attempted to purchase merchandise with counterfeit money at a Stein Mart store (id. at 3); (3) the couple was inside the Stein Mart store at the time

17

of a call to Agent Jordon (id.); (4) a Stein Mart employee had positively identified the couple who had attempted to pass counterfeit money (id. at 3-4); and (5) the identified couple had left the store and entered Smith's car (id. at 4). These facts were sufficient to warrant a prudent person believing that Smith had committed the crimes of knowingly attempting to pass counterfeit money, knowingly possessing and concealing counterfeit money, and conspiring to commit those crimes. Campbell, 486 F.3d at 957; see also 18 U.S.C. § 371 (criminalizing conspiracies between two or more persons to commit any offense against the United States or to defraud the United States); 18 U.S.C. § 472 (stating that "[w]hoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell . . . or keeps in possession or conceals" counterfeit money "shall be fined under this title or imprisoned not more than 20 years, or both").

When confronted with analogous facts, courts have found probable cause to support an arrest. The United States Court of Appeals for the Sixth Circuit has stated:

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. An eyewitness identification will constitute sufficient probable cause "unless, at the time of the arrest, there is apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the

confrontation.'"   This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999) (citations omitted).   The Sixth Circuit has also concluded that probable cause existed to support an arrest where a robbery victim described the features and attire of his attacker and the police arrested a person matching the description near the location of the robbery.   See Rainer v. Lis, No. 92-2436, 1994 WL 33969, at *2-3 (6th Cir. Feb. 7, 1994) (unpublished table decision) (per curiam).   The Sixth Circuit rejected the assertion that officers had to forego arrest pending further investigation because the facts as initially discovered provided probable cause for the arrest.   See id. at *3.

In this case, the agents had a positive identification of Smith and Hinton as the couple passing counterfeit money by a Stein Mart employee before an arrest occurred, along with separate calls from Neyland and Swain stating that a couple had recently attempted to pass counterfeit money at Casual Male and Stein Mart.   (See Report 2-4.)   There was no reason for agents to question the veracity of the telephone callers or the positive identification made by a Stein Mart employee. Therefore, the agents had probable cause to arrest Smith.   See Rainer, 1994 WL 33969, at *2-3; see also Fisher, 2010 WL

19

3419700, at *4-5 (holding that police had probable cause to support a warrantless arrest where an employee called police and informed them that a store patron was attempting to cash counterfeit money orders, the police viewed the employee as credible, the employee identified the patron who attempted to cash fake money orders, and a police officer verified the money orders were counterfeit); Franklin, 214 F. App'x at 511-12 (finding probable cause to arrest based on the statements of two eyewitnesses); Armstrong, 16 F.3d at 294 (holding that there was probable cause to support an arrest based on a store clerk's positive identification of the person who gave her a counterfeit $20 bill when she saw him on the street and at the scene of his arrest); Hernandez, 825 F.2d at 849 ("Generally, probable cause to arrest for the offense of passing a counterfeit note is established by circumstances showing the passing of a counterfeit note coupled with an identification of the individual who passed the note.") (citations omitted); Everett, 719 F.2d at 1120 ("While intent is an element of the crime which must be proved at trial, it is not necessary in order to establish probable cause to arrest.   The passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note.") (citations

20

omitted).    The   Court,   therefore,   OVERRULES   Smith's   second

objection to the Report of the Magistrate Judge.[7]

### C.   Hinton Voluntarily Consented to the Search

Smith's   third   objection   is   to   Magistrate   Judge   Pham's

conclusion that Hinton voluntarily consented to the warrantless

search  of  the  apartment  where  Hinton  and  Smith  resided.[8]   (See

---

[7] Because Smith specifically objects only to the Magistrate Judge's conclusion
that the agents had probable cause to arrest him, the Court need not address
the Magistrate Judge's proposed findings of fact and conclusions of law about
events that occurred proximate in time to Smith's entering his car.  See
Peoples v. Hoover, 377 F. App'x 461, 462 (6th Cir. 2010) ("Parties, we have
long held, forfeit appellate review of arguments not raised as objections to
a magistrate's report.").   They are adopted without further review.   See
McClanahan v. Comm'r of Soc. Sec., 193 F. App'x 422, 429 (6th Cir. 2006)
("[O]nly those specific objections to the magistrate's report made to the
district court will be preserved for appellate review; making some objections
but failing to raise others will not preserve all the objections a party may
have." (quoting Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370,
1373 (6th Cir. 1987))); Cole, 7 F. App'x at 356 ("This court requires
litigants to file specific and timely objections to a magistrate judge's
report and recommendation under 28 U.S.C. § 636(b)(1)(C) in order to preserve
the right to appeal a subsequent order of the district court adopting that
report.") (citations omitted); Elder v. Berghuis, 644 F. Supp. 2d 888, 892
n.2 (W.D. Mich. 2009) (listing cases for the proposition that "[d]istrict
judges in our circuit have long adopted R & Rs without additional analysis
where the parties have not timely and specifically objected" and adopting a
magistrate   judge's   recommendations   about   certain   habeas   claims   without
review); Nottingham v. Comm'r of Soc. Sec., No. 1:08-cv-157, 2009 WL 230131,
at *2 (W.D. Mich. Jan. 29, 2009) ("[T]he failure to file timely specific
objections obviates not only de novo district-judge review of the R & R, but
all district-judge review.").

[8] The Court construes the fourth, fifth, sixth, eighth, tenth, and eleventh
paragraphs of Smith's Objections as raising this objection.    The fourth
paragraph states: "The defendant objects to the Magistrate abdicating it's
[sic] authority to properly ascertain the facts surrounding this arrest and
consent in order to gain a full grasp the totality of the circumstances [sic]
as instructed by the Supreme Court."   (Objections 2.)   The fifth paragraph
states in relevant part: "The defendant objects to the Magistrate implying
that it was the defendant's responsibility to present facts supporting his
argument of coercion or duress when it is the governments [sic] burden to
prove that consent was given voluntarily."   (Id.)   The sixth paragraph
states: "The defendant objects to the Magistrate's finding that there was no
coercion involved to gain Hinton's consent when the evidence, including
telephone calls and statements written during the search says [sic]."   (Id.)
The eighth paragraph states: "The Fourth and Fourteenth amendments require
that a consent not be coerced, by explicit or implicit means, by implied
threat or covert force."   (Id. at 3.)   The tenth paragraph states: "The

21

Objections 2-3; Report 20 (finding that Hinton's consent to the search of the apartment was voluntary).)  The basis for Smith's objection is his assertion that the government did not meet its burden of proving that Hinton's consent was voluntary and that Hinton was handcuffed when she gave consent.  (See Objections 2-3.)

"Under the Fourth Amendment, searches 'conducted without a warrant issued upon probable cause [are] per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  One such exception is consent.  Id.  "If an officer obtains consent to search, a warrantless search does not offend the Constitution."  Id. (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)).  "Indeed, '[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'"  Id. (quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (alteration in original)).  "Such consent, however, must be voluntary and freely given."  Id. (citing Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)).  "Consent is voluntary when it is 'unequivocal, specific, and intelligently given, uncontaminated by any duress

defendant objects to the Magistrate's finding that Hinton wasn't handcuffed when agent Barker testified she was."  (Id.)  The eleventh paragraph states in relevant part: "[T]he defendant objects to the Magistrate's finding that Hinton betrayed the defendant by cooperating . . . ."  (Id.)

or coercion.'" Id. (quoting United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977)).

Courts must consider several factors in determining whether consent was voluntary:

> To determine if consent was voluntary, a district court must look at the totality of the circumstances and examine the following factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police."

United States v. Ables, 280 F. App'x 513, 516 (6th Cir. 2008) (quoting United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999)). The government has the burden of proving that consent to a search was voluntary through "clear and positive testimony." Moon, 513 F.3d at 537 (quoting United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978)).

Here, the government has met its burden of proving that Hinton voluntarily consented to the search of the apartment where the agents observed and seized evidence of a counterfeiting operation. Hinton signed a form authorizing the agents to conduct a complete search of the apartment and seize any property that was contraband or evidence in the nature of counterfeit and stating that "[t]his written permission is being given by me . . . voluntarily and without threats, duress, or promises of any kind." (Hr'g Ex. 6.) The testimony of agents

at the suppression hearing confirms that the agents never promised that they would release her or Smith if she consented and that she was not handcuffed or restrained when she gave consent.[9] (See Hr'g Tr. 55:2-10, 56:16-18, 65:6-9, 70:14-18, 83:17-20, 87:13-15.) Although the record shows that she did not want Smith to be charged with a crime (see id. 68:5-17, 79:1-6; Hr'g Ex. 8), it also shows that she voluntarily agreed to show the agents where the apartment was located and verbally consented to the search of the apartment before signing the consent form and after waiver of her Miranda rights and her confession (see Report 19-20; Hr'g Tr. 35:9-20, 50:17-51:4, 63:21-25, 65:6-66:16). She gave the agents her key to the apartment and never revoked her consent or took any action inconsistent with her voluntary choice to allow agents to search the apartment. (See Report 20; Hr'g Tr. 66:23-25, 71:8-11, 82:11-18.)

Under the totality of the circumstances, Hinton's consent was voluntary because her consent was "'unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion.'" Moon, 513 F.3d at 537 (quoting McCaleb, 552 F.2d at 721). All of the factors this Court must consider demonstrate

---

[9] Smith is correct that, at one point, Hinton was handcuffed. That occurred after she had consented to the search while the agents transported her to the apartment, pursuant to Secret Service policy. (See Hr'g Tr. 81:22-25.) The agents removed her handcuffs once they arrived at the apartment. (See id. 82:1-7, 88:24-89:2.)

that Hinton's consent was voluntary.  See Ables, 280 F. App'x at 516.  Her age, intelligence, and education establish that she was capable of giving consent.  The lease to rent the apartment was in her name, she was living independently of her parents, and she gave a handwritten statement to the agents.  (See Report 6; Hr'g Ex. 5; Hr'g Ex. 8.)  She understood the right to refuse consent and her constitutional rights, as evidenced by the agents' reading the Miranda waiver to her, having her read it aloud (Hr'g Tr. 64:3-14), her signing the Miranda waiver (Hr'g Ex. 7), and her consenting to the apartment search verbally (see Hr'g Tr. 35:9-20, 66:6-25) and in writing (Hr'g Ex. 6).  The length of her detention was short and the nature of the detention was characterized by her cooperativeness.  (See Report 6-8.)  The agents never used any coercive or punishing conduct.  (See id.)  Therefore, the government has met its burden of proving that Hinton's consent to the search of the apartment was voluntary.  See Moon, 513 F.3d at 537.

Smith offers no facts to support his assertion that the agents coerced Hinton to obtain her consent to the search of the apartment other than recorded telephone conversations in which Hinton said she cooperated because the agents promised her that they would let Smith go if she did.  (Report 10 n.10.)  The Magistrate Judge correctly found that Hinton's statements during the telephone calls are not credible, given that Hinton in the

recordings falsely told Smith that she did not tell agents Smith was involved in counterfeiting, notwithstanding the fact that she wrote and signed a statement describing Smith's role in the counterfeiting operation.[10]   (Id.; Hr'g Ex. 8.)   The Court, therefore, OVERRULES Smith's third objection to the Report of the Magistrate Judge.

### D.   The Government Did Not Use Coercion to Obstruct Justice at the Suppression Hearing

Smith claims that the government used coercion to obstruct justice during the suppression hearing by preventing Hinton from testifying.   (Objections 2-3.)   Hinton did not testify because she refused to waive her Fifth Amendment privilege against compelled self-incrimination.   (Hr'g Tr. 119:13-25).   Therefore, Smith's claim is without merit.   See Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000) ("The Supreme Court has given the privilege against self-incrimination a broad scope, explaining that "[i]t can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." (quoting Kastigar v. United States, 406 U.S. 441, 445-45 (U.S. 1972))).

### IV.   Conclusion

---

[10] The eleventh paragraph of Smith's objections concedes that Hinton "lied to him." (Objections 3.)

For the foregoing reasons, Smith's objections are not well-taken.  The Court ADOPTS the Report and Recommendation of the Magistrate Judge and DENIES the Motion to Suppress.  All findings and conclusions of the Magistrate Judge not discussed above have not been specifically objected to and are adopted.

So ordered this 12th day of October, 2010.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE